IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VALERIE RALSTON, ex rel. ) | |
| E.M., a minor ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 7434 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Valerie Ralston ("Ms. Ralston"), on behalf of her minor nephew, E.M., has filed a motion for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying E.M.'s application for Supplemental Security Income ("SSI") (doc. # 13). The Commissioner filed a cross-motion for summary judgment asking the Court to affirm the decision denying disability benefits (doc. # 18). For the following reasons, we grant Ms. Ralston's motion and deny the Commissioner's motion.

I.

E.M. was born on April 15, 2005 (R. 153). When he was six years old, Ms. Ralston, the paternal aunt of E.M.'s sister, became E.M.'s legal guardian (R. 149). Ms. Ralston applied for SSI on E.M.'s behalf on April 2, 2014, alleging a disability onset date of January 14, 2014 (R. 80). After the application for benefits was denied initially and upon reconsideration, Ms. Ralston received a hearing before an Administrative Law Judge ("ALJ"), who thereafter issued a written

---

[1]On November 6, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

opinion finding E.M. was not entitled to SSI benefits. The Appeals Council denied Ms. Ralston's request for review of the ALJ's decision (R. 1), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981; *Loveless v. Colvin*, 810 F. 3d 502, 506 (7th Cir. 2016).

## II.

On January 17, 2014, when he was in third grade, E.M. was admitted for inpatient acute care at Hartgrove Hospital because he had been starting fires and he was deemed a danger to himself or others (R. 279-80). E.M. was diagnosed with mood disorder, NOS, and impulse control disorder, and he was prescribed Risperdal, an antipsychotic used to decrease impulsive behavior, and Ritalin, a stimulant used to increase focus, attention, and organization (R. 254-56). E.M. was discharged from inpatient care on February 3, 2014 and admitted the next day to a partial hospitalization program ("PHP") at Hartgrove, where E.M. spent days at the hospital but came home in the evenings (R. 293). He was discharged from the PHP program on February 14, 2014, with diagnoses of mood disorder, NOS, and attention deficit hyperactivity disorder ("ADHD") and prescriptions for Risperdal and Ritalin (*Id.*).

After his discharge, E.M.'s medications were managed by psychiatrists at Metropolitan Family Services ("MFS"), where he also saw a therapist weekly. At his first visit to MFS on February 26, 2014, E.M. was moody, depressed, teary and argumentative (R. 414-16). In addition to setting fires, his problem behaviors were listed as stealing, impulsivity and lying (R. 416). Ms. Ralston reported E.M. had a history of stealing and getting into fights at school (*Id.*). In March 2014, E.M. appeared angry, hyperactive, anxious and depressed, although his mental status examination was otherwise within normal limits (R. 370). Ms. Ralston reported significant improvement in E.M.'s fire-setting behaviors with medication, but he was still stealing things from

classmates and lying about his behavior (R. 369-72). A psychiatric progress note from May 2014 stated that E.M. had an increased problem with stealing from home and school, and that he had been suspended from school for stealing from the teacher (R. 539). His therapist noted that he was sad, argumentative and distracted, but otherwise within normal limits (R. 469-70). In July 2014, Ms. Ralston reported that E.M.'s stealing behaviors had significantly improved, but he still stole food or toys from his teacher (R. 537).

On August 8, 2014, E.M. was evaluated by child psychologist, Kari E. Poby, Psy.D., for the Bureau of Disability Determination Services (R. 341). Dr. Poby found E.M. was alert, polite, talkative, cheerful, and cooperative throughout her evaluation, although he was fidgety and often out of his seat (R. 342). On August 21, 2014, non-examining state agency psychological consultant David Voss, Ph.D., reviewed the evidence of record and opined that E.M. had severe mood disorder and severe ADHD (R. 75-76). He evaluated the severity of E.M.'s impairments across the six domains set forth in 20 C.F.R. § 416.926a(b): (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Dr. Voss opined E.M. had marked limitations in interacting and relating with others, less than marked limitations in acquiring and using information and attending and completing tasks, and no limitations in moving about and manipulation of objects, caring for himself, and health and physical well-being (R. 75-77).

In October 2014, E.M. reported that he was having difficulty paying attention in school and was failing math (R. 529). Ms. Ralston noted E.M. was struggling more in the afternoon, so his psychiatrist prescribed an increased dose of sustained release Ritalin (*Id.*). E.M.'s psychiatrist opined that E.M.'s psychiatric issues were stable, and his behavior was improving (R. 377-79). In November 2014, the psychiatrist observed he was restless with a slight increase in oppositionality

and irritability (R. 527). E.M. reported continued difficulty focusing and getting distracted in class, but his aunt believed E.M. was causing the distractions (*Id.*). Ms. Ralston reported that she had not seen any improvement after the change in E.M.'s Ritalin dosage (*Id.*). In January 2015, the psychiatric report noted improvement in E.M.'s impulsivity, but continued disruptive behavior, emotional lability, crying episodes, and trouble focusing (R. 521). E.M.'s psychiatrist switched E.M. from Ritalin to Focalin due to his continuing problems with inattention (R. 526).

In March 2015, Carmina Fuqua, E.M.'s fourth grade teacher, completed an ADHD Diagnostic Teacher Rating Scale. Ms. Fuqua indicated E.M. "very often" left his seat, fidgeted, squirmed, acted as if "driven by a motor," interrupted others, and intruded on their activities (R. 244). She found that E.M. "often" ran or climbed excessively, had difficulty waiting in line, failed to pay attention to details, made careless mistakes, had difficulty sustaining attention, was easily distracted by outside stimuli, and was forgetful in daily activities (*Id.*). Ms. Fuqua rated E.M. as "problematic" in the areas of class disruption and organizational skills, but average in his relationships with peers, following rules and directions, and assignment completion (R. 245).

In March and April 2015, E.M.'s psychiatrist noted that his irritability and mood swings had increased, possibly due to a visit from his biological parents (R. 523). Ms. Ralston and the psychiatrist noted that E.M. cried often at home and at school (R. 205, 210, 524). On May 1, 2015, a non-examining state agency psychological consultant acknowledged additional evidence since August 2014 "indicate[d] a worsening of the child's current impairments," but assessed E.M. at the same severity levels in the six domains as the August 2014 consultative opinion (R. 85-88).

In May 2015, an updated mental health treatment plan from MFS noted that E.M. had made some progress in his ability to control his anger and aggressiveness, but he continued to have trouble focusing, concentrating and completing tasks, to be impulsive and hyperactive, and to steal

4

items from home and school and lie to get his way (R. 451-54). His mental health status assessment showed he was argumentative, hyperactive and depressed, but otherwise normal (R. 452). Another psychiatric note from May 2015 indicated he had been spitting out his medications (R. 518). In early August 2015, E.M.'s aunt reported issues with stealing, increased moodiness, and lying; she requested a medication increase to address these concerns (R. 516). The MFS psychiatrist added a morning dose of Focalin to E.M.'s medicine regimen (*Id.*).

In October 2015, the psychiatrist observed E.M. was very fidgety, hyperactive and impulsive (R. 511). Ms. Ralston reported that E.M.'s ADHD symptoms improved with medication, but she asked for a higher dose of Risperidone because E.M. continued to lie, steal, and manipulate others (*Id.*). In November 2015, an MFS treatment plan noted that E.M.'s lying and stealing behaviors had intensified, and he continued to have some negative interactions with peers at school (R. 445). A psychiatric report also noted E.M. was still crying frequently, most often when he got into trouble (R. 514). In December 2015 and January 2016, E.M.'s psychiatrist noted he had improved impulse control, but he continued to provoke and sometimes bully his peers, have frequent crying spells, and lie regularly (R. 505, 507).

E.M.'s mental health treatment plan from May 2016 added a diagnosis of unspecified bipolar and related disorder (R. 436). The report stated that E.M. "has had a year of fluctuation when it comes to managing his moods and following rules and expectations" (R. 438). While E.M. made some improvements over the previous year in being able to control his anger and aggressiveness, he continued to steal from others, lie to get his way, have crying spells, and have trouble at school with peers (R. 438, 440-41). The mental health assessment showed E.M. was hyperactive, easily distracted and depressed, but was otherwise within normal limits (R. 439-41). A psychiatric progress note from that month stated that E.M. seemed more moody (R. 495).

On August 15, 2016, E.M. and Ms. Ralston testified at a hearing before the ALJ (R. 40). E.M. testified that he could dress and bathe himself and use a microwave, but his aunt had to watch him take his medication so he would not spit it out, which he had done before (R. 44-48). Ms. Ralston confirmed that every morning someone looked in E.M.'s mouth to make sure he swallowed his medication (R. 64). E.M. related that at camp that summer, he was accused of stealing during a field trip to the zoo (R. 50-53). Ms. Ralston testified that E.M. stole primarily from family members, but she had been contacted by the school about it as well (R. 54). E.M. also recently stole something from Walmart, although he denied it (R. 55, 62). Ms. Ralston testified that E.M.'s behavior significantly improved for a while after he started taking medication, but then his "behavior started coming back" and "changing;" he cried "almost daily" for seemingly no reason (R. 59-63). E.M.'s psychiatrist increased his medication multiple times, but Ms. Ralston believed E.M.'s behavior was worsening; for example, the previous week, Ms. Ralston gave up her dog because E.M. was kicking it and grabbing its neck (R. 62-64, 68).

### III.

On September 13, 2016, the ALJ issued a written opinion denying E.M. disability benefits (R. 34). An individual under the age of 18 will be found disabled for the purposes of receiving SSI benefits if they have a medically determinable "physical or mental impairment, which results in marked and severe functional limitations" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To make this determination, the ALJ applies a three-step sequential test. 20 C.F.R. § 416.924(a).

Step 1 asks if the child has engaged in substantial gainful activity. Because E.M. was a school-aged child, the ALJ found he had not engaged in substantial gainful activity (R. 23). At Step 2, the ALJ must determine whether the child has a severe and medically determinable

impairment or combination of impairments. The ALJ determined E.M. had the following severe impairments: depression and ADHD (*Id.*). (However, throughout the opinion the ALJ refers to E.M.'s alleged impairments as mood disorder and ADHD).

At Step 3, the ALJ must determine whether the child's severe impairments meet, medically equal, or functionally equal the severity of a Listing by evaluating the impairments across six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; (6) health and physical well-being. 20 C.F.R. § 416.926a(b). To functionally equal a Listing, the child's impairment must create an "extreme" limitation in one or more domains or a "marked" limitation in two or more domains. *Id.*

Before evaluating E.M.'s impairments across these domains, the ALJ reviewed E.M.'s and Ms. Ralston's testimony as well as the medical evidence. The ALJ determined that E.M.'s and his aunt's statements concerning the intensity, persistence and limiting effects of E.M.'s symptoms -- such as spitting out his medication, stealing, and lying -- were "not entirely consistent" with other evidence in the record (R. 24-25). The ALJ found the medical record showed that throughout 2014, after he was hospitalized and put on medication, E.M.'s behaviors improved, and his mental status examinations revealed "mostly normal findings," although he still appeared fidgety and restless (R. 25-26). Likewise, in 2015 and 2016, the ALJ found the medical record showed improvement in E.M.'s ability to control his anger, impulses and aggressiveness and his mental status examinations revealed mostly normal findings, although E.M. still had difficulties with peers at school, impulsive behavior, taking things, argumentativeness, hyperactivity and focusing (R. 27). The ALJ also reviewed Ms. Fuqua's teacher assessment, which noted E.M. made careless mistakes, had difficulty sustaining attention, and was easily distracted, forgetful, and disruptive in

class, but the ALJ concluded that E.M.'s "behavior at school has also improved" (R. 27-28). In addition, the ALJ stated that E.M. was "calm and appropriate" at the hearing (R. 28).

The ALJ adopted the state agency consultative opinion rating E.M.'s functional limitations across the six domains in most respects (R. 28). *First*, the ALJ agreed that E.M. had less than marked limitation in the domain of acquiring and using information because although E.M. had some trouble staying seated in school and disrupting class, his school performance was average and he could sometimes do homework on his own (R. 28-29). *Second*, the ALJ agreed that E.M. had less than marked limitation in the domain of attending and completing tasks (R. 30). Although the ALJ acknowledged that E.M. could be disruptive and fidgety in school, took a long time to get ready, and could read or sit for 30 minutes, the ALJ found that E.M.'s mental health examinations were mostly normal, with normal memory and grossly intact concentration and attention (*Id.*). *Third*, the ALJ agreed with the state agency psychologist that E.M. had marked limitations in the domain of interacting and relating with others (R. 31). The ALJ noted that E.M. fought with his sister, had stolen from his family and stores, was aggressive towards his dog, and had some residual behavioral and impulse control issues at school and at home, although those issues improved with medication (*Id.*). *Fourth*, the ALJ agreed that E.M. had no limitations in the domains of moving about and manipulating objects and health and physical well-being (R. 32-34).

However, the ALJ disagreed with the state agency psychologist's finding that E.M. had no limitation in the domain of caring for himself, because while this finding was "reasonable based on the evidence available at the time . . . , the evidence received at the hearing level show[ed] that the claimant's impairments cause less than marked limitations in the domain of caring for himself, as supported by the evidence of aggression, not taking his medications, and ongoing issues with stealing" (R. 28). Nevertheless, the ALJ found "later evidence shows that his behavior and impulse

8

control has improved," and E.M. testified that he was able to dress and bathe himself, brush his teeth, microwave meals and clean the bathroom (R. 33). Because the ALJ found E.M. did not have marked limitations in two domains of functioning, she found E.M. was not disabled (R. 34).

## IV.

We review the ALJ's decision to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alvarado v. Colvin*, 836 F.3d 744, 747 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Ralston asserts that the ALJ did not adequately support her findings that E.M. had less than marked limitations in the domains of caring for himself and attending and completing tasks. For the reasons that follow, we agree with Ms. Ralston. And, because a marked finding in either of these domains -- together the ALJ's marked finding in the domain of interacting and relating with others -- would mean E.M.'s impairment functionally equaled a Listing, remand is necessary.[2]

### A.

The ALJ concluded that "[o]verall, the evidence shows that the claimant's impairments cause less than marked limitation in the domain of caring for himself" (R. 33). In evaluating this domain, the ALJ explained that since the state agency opinion in August 2014, which found E.M. had no limitation in this domain, there was "evidence of aggression, not taking his medications,

---

[2]Because we find remand is necessary on this basis, we do not reach Ms. Ralston's argument that the ALJ failed to properly evaluate E.M.'s subjective allegations (doc. # 14: Pl.'s Br. in Supp. of Mot. at 10).

9

and ongoing issues with stealing" (R. 28), although behaviors such as starting fires had improved (R. 33). In addition, the ALJ noted that E.M. was able to dress and bathe himself, brush his teeth, and perform basic household chores (*Id.*). Ms. Ralston contends the ALJ's analysis omitted evidence supporting E.M.'s claim for disability and did not build a logical bridge between the evidence and her conclusion that E.M. had less than marked limitations in the domain of caring for himself (doc. # 14: Pl.'s Br. in Supp. of Mot. at 5-6). We agree.

The regulations state that a child of E.M.'s age (between the ages of 6 and 12) should be independent in daily activities like dressing and bathing, "begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior," and "begin to demonstrate consistent control over [his] behavior and . . . avoid behaviors that are unsafe or otherwise not good for [him]." 20 C.F.R. § 416.926a(k)(2)(iv). A "less than marked limitation" means a child's impairment does not "interfere[] seriously with [his] ability to independently initiate, sustain, or complete activities." *Id.* at § 416.926a(e)(2)(i).

The Seventh Circuit "require[s] an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies." *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487-88 (7th Cir. 2007). Here, the ALJ found the evidence that E.M. continued to steal, show aggression, and refuse to take his medication showed he had some limitation in the domain of caring for himself (R. 28). The ALJ also considered E.M.'s aggression toward Ms. Ralston's dog, at least as evidence that E.M. had marked limitations in the domain of interacting and relating with others (R. 31). "[H]owever, the ALJ did not explain why these findings were insufficient to find a marked limitation" in the domain of caring for oneself, which includes understanding right from wrong and avoiding unsafe and harmful behaviors. *Giles*, 483 F.3d at 488.

In addition, as Ms. Ralston points out, the ALJ overlooked evidence of E.M.'s frequent crying spells and mental status evaluations showing he had impaired insight and judgment (Pl.'s Br. at 6-7). It is well-settled that "an ALJ may not ignore evidence that undercuts her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018). Here, however, the ALJ focused on the "mostly normal" findings in E.M.'s mental status examinations but did not discuss the negative findings also revealed in some mental status examinations. Likewise, the ALJ did not address E.M.'s frequent crying spells, which were frequently mentioned throughout the record.³

Moreover, the ALJ's determination that E.M.'s fire-starting and other impulsive behavior had "improved" tells us little about the severity or extent of E.M.'s functional limitations. A marked limitation is not a fixed point. For example, a child with marked limitation may show improvement and still fall within the zone of marked limitations. Or, a child with extreme limitations may show improvement and still have marked limitations. Thus, a child's limitations, even in an "improved state, nevertheless may be marked." *Muncy v. Colvin*, No. 12 C 2942, 2015 WL 361463 at *4 (N.D. Ill. January 28, 2015) (internal quotations omitted). *See also Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled"). Accordingly, the ALJ's finding that E.M. had less than marked limitations in the domain of caring for himself required further explanation.

---

³The Commissioner argues that "[a] child crying and denying wrongdoing when he gets in trouble is not the type of regressive or maladaptive behavior contemplated by this domain" (doc. # 19: Def.'s Mem. in Supp. of Summ. J. at 7). However, the Commissioner cites no support for this contention beyond noting that the regulations give sucking one's thumb as one example of regressive behavior (*Id.*, citing SSR 09-7p, 2009 WL 396029 (S.S.A. Feb. 17, 2009) at *6). By contrast, several mental health reports in the record noted E.M.'s frequent crying spells as areas of concern. Further, we note that the regulations list crying as "typical" behavior for newborns and infants, not for school-age children. *See, e.g.*, SSR 09-7p, 2009 WL 396029, at *2.

**B.**

The ALJ also found that "[o]verall, the evidence shows that the claimant's impairments cause less than marked limitation in the domain of attending and completing tasks" (R. 30). In evaluating this domain, the ALJ acknowledged that E.M. and his aunt testified that it took E.M. "a long time to get ready in the morning due to issues with focus," he could sit for about 30 minutes but was fidgety, he sometimes needed help with his homework, he had trouble remembering tasks given to him, and he had trouble staying in his seat at school (*Id.*). In addition, the ALJ recognized Ms. Fuqua reported E.M. had "some issues with disrupting the class and his organizational skills" (*Id.*). On the other hand, the ALJ found that E.M.'s "mental status examinations . . . revealed mostly normal findings with normal recent and remote memory," "[h]is attention and concentration were grossly intact," "[h]is fund of knowledge was clinically estimated to be average," and Ms. Fuqua found he "had average performance in following direction/rules and assignment completion" (*Id.*). Ms. Ralston contends the ALJ focused on this evidence that supports her decision that E.M. had less than marked limitations in the domain of attending and completing tasks, without sufficiently addressing contrary evidence (Pl.'s Br. at 7-8). Again, we agree.

Under the domain of attending and completing tasks, the regulations provide that "we consider how well you are able to focus and maintain your attention and how well you begin, carry through, and finish activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). A child of E.M.'s age (between the ages of 6 and 12) should be able to focus in a variety of situations, follow directions, organize school materials, concentrate on details, avoid careless mistakes, change activities without distraction to self or others, and "stay on task and in place when appropriate." 20 C.F.R. § 416.926a(h)(2)(iv).

Although they are not required to analyze every piece of evidence in the record, "ALJs are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings." *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). In this case, the ALJ's statement that E.M. had "some issues with disrupting the class and his organizational skills" but otherwise "average" performance fails to grapple with Ms. Fuqua's opinion that E.M. also had more serious behavioral concerns relating to the domain of attending and completing tasks. Specifically, the ALJ failed to discuss Ms. Fuqua's assessment that E.M. "very often" left his seat, fidgeted, squirmed, acted as if "driven by a motor," interrupted others, and intruded on their activities; "often" ran or climbed excessively, had difficulty waiting in line, failed to pay attention to details, made careless mistakes, had difficulty sustaining attention, was easily distracted by outside stimuli, and was forgetful in daily activities; and was "problematic" in the areas of class disruption and organizational skills (R. 244-45).

Although the Commissioner points out that the ALJ recited Ms. Fuqua's findings in her summary of the evidence in the record, "summarization is not a substitute for analysis." *Davis ex rel. A.L. v. Berryhill*, No. 17 C 2190, 2018 WL 3463280 at *5 (N.D. Ill. July 18, 2018). Indeed, although "[t]he ALJ summarized a tremendous amount of evidence," she did not sufficiently analyze how the evidence showing serious or problematic behavior impacted E.M.'s limitation in the domain of attending and completing tasks. *Williams v. Colvin*, No. 14 C 2172, 2016 WL 880531, at *3 (N.D. Ill. Mar. 1, 2016). The ALJ erred by not explaining why the behavioral concerns expressed by Dr. Fuqua were not serious enough to constitute a marked limitation in attending and completing tasks. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 701 (7th Cir. 2009).

Additionally, the ALJ relied on the assessment of E.M.'s clinicians that his attention and concentration were "grossly intact" and his mental status examinations were "mostly normal." However, the ALJ did not weigh the parts of E.M.'s mental status examinations and psychiatric treatment plans that were not normal -- such as his continued difficulties focusing, concentrating, disrupting and fidgeting – that could "paint a very different picture" of E.M.'s functional limitations in attending and completing tasks. *Richardson o/b/o T.H. v. Berryhill*, No. 17 CV 6350, 2018 WL 3608563, at *5 (N.D. Ill. July 27, 2018). These issues require remand.

## CONCLUSION

For the reasons stated above, we grant Ms. Ralston's motion for summary judgment (doc. # 13) and deny the Commissioner's motion (doc. # 18). We remand the case for further proceedings consistent with this opinion.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: November 28, 2018